May Term,
1860.

Helton
v.
Miller.

———————— ·—◦◦—· ————————

## Helton and Others *v.* Miller and Others.

The convicts in the state prison, other than those sent to *Michigan City* under the act of 1859, cannot, under existing statutes, be worked outside the prison and the adjoining state grounds.
If a cause of complaint for working them elsewhere, arise in *Clark* county, the *Floyd* Circuit Court has no jurisdiction in the suit.

APPEAL from the *Floyd* Circuit Court.

Perkins, J.—*Willian Helton*, and three other persons, applied to the *Floyd* Circuit Court for a mandate to the warden and directors of the state prison at *Jeffersonville*, commanding them to withdraw the convicts belonging to said prison from the surrounding cities and country, where they were hired out to labor, and to confine them within the prison limits.

It is alleged that a part of the convicts are employed in a brick-yard near the prison, and a part among the community at remote distances from it; that the brick-yard adjoining the prison is upon the ten acre tract of ground purchased and owned by the state for prison purposes, which ground is enclosed by a common board fence, with

Thursday,
August 23.

suitable guard-houses, and that bricks have been made there by the convicts, a fact of general notoriety, for the last fifteen years.

The whole number of convicts belonging to the prison is five hundred and seventy-six, of which number but two hundred and twenty-three have found work inside the state's inclosure. The shops belonging to the prison will only accommodate two hundred and seventy-five laborers, and there is room to erect no more shops. There are but three hundred and forty-three single cells, and there is no building or inclosure within the walls where idle men can be kept during the day, especially in summer, without great danger of sickness and insurrection, nor is there any room for the erection of such building or inclosure. The cost of feeding and clothing each convict is $31\frac{1}{2}$ cents per day, and the prison has no income but the proceeds of convict labor. The convicts have been publicly and notoriously worked outside of the prison bounds for the last fifteen or twenty years. They are worked under guards, returned and locked up in the prison at night, have the same opportunities for receiving instruction and medical treatment as though worked inside, &c. Such is a full statement of the facts of the case; and upon it counsel on both sides have furnished very able and thorough arguments.

The ground on which the mandate was asked is, that the law does not allow the working of convicts beyond the prison limits; that it is injurious to citizen laborers with whom they come in contact, and competition; and that the presence of the convicts is offensive and demoralizing to the community among whom they are permitted to mingle as laborers.

The disposition to be made of convicted criminals—the treatment that should be meeted out to them—has presented a uniformly embarrassing question to government, since the time when *Howard*, the philanthropist, aroused public attention to the subject by publishing the results of his explorations of the "mansions of sorrow and pain," in which such criminals were confined by the governments of *Europe*.

Transportation, solitary confinement, silent labor, and social labor, have all been tried, but without satisfactory results, in the punishment of convicts.

Later has sprung up the idea of reform of the convict, *pari passu,* with punishment and profit through his labor.

In the present state of society and condition of things, it is to be feared this latter idea will fail of realization but to a very limited extent; the buddings of reform, commenced in prison, if, indeed, they are commenced, will not be protected and fostered till they shall blossom in the convict free, but will be withered and blighted by the chill of neglect and scorn which will greet him on his return to the community. He will not be received into respectable society. Confidence will not be extended to him. Employment will not be given to him by respectable men, for respectable men will not labor in company with him. And we have no penitentiary-convict-employment societies to step forward and receive him in their embraces. He becomes, therefore, almost necessarily an *Ishmaelite*, his hand against every man in community. He resumes his marauds. He inveigles and seduces others, especially of the young, into his schemes and his overt acts of crime; and in a little while he leads back a sad company from sadder homes to experience the reforming influences of the state prison. Thus it is that every discharged convict becomes but a mere recruiting officer for the penitentiary; and such convicts are issuing from it and overflowing upon the community in an incessant stream.

In view of these facts the writer of this opinion would hold, that a part of the policy of punishment for infamous crime, committed under circumstances indicating great moral turpitude, should be the removal, and forever, of the polluted criminal from society, that it might, in future, be saved from his contaminating touch; and to this end he would have but two measures of punishment for this class of crimes, to-wit, capital and imprisonment for life. No man should ever be permitted to return from the penitentiary—a man of depravity—to prey upon the community, or demoralize it by contact. Lesser offenses, and such as do

not involve great moral turpitude, should be punished in a way that may not attach infamy to the individual.

From what has been said it will be manifest that if the statute of the state does authorize the working of penitentiary convicts outside of the prison limits, and among the community, the statute is a bad one, considered as a permanent regulation. Such working for a temporary object, as the erection of a public building by the state, might be tolerated. But as a permanent measure of policy, the state should, in our judgment, provide herself with grounds and buildings sufficiently extensive to accommodate at work and at repose all her convicts.

But the question submitted to us is, not what the law should be, but what it is; and if the legislature has seen fit to authorize the working of the convicts outside of the prison bounds, no one, save the convicts themselves, can, we take it, dispute the validity of the law, and refuse to obey it while it remains upon the statute book; and as such working would undoubtedly be held a mitigation rather than an aggravation of the punishment of the convicts, they could not withhold obedience to the law. *Strong* v. *The State*, 1 Blackf. 193.

Does, then, the statute law of this state authorize the working of penitentiary convicts outside of the prison limits?

The code of 1852 provides, as the general rule, that when any person is convicted of a felony, he "shall be imprisoned in the state prison" for the time he is to undergo punishment. 2 R. S. p. 396, *et seq.*

Such has been the law since the organization of the government; and by 2 R. S. p. 424, § 59, it is enacted that "whenever any person is imprisoned in the state prison, he or she shall be kept at hard labor therein, during the period forwhich such person was sentenced."

These provisions not only do not allow, they in effect forbid, the working of the convicts outside of the prison limits.

We have found no subsequent statute that permits such

working of the convicts, except for some special temporary purpose named in the statute (but we have found those that expressly forbid it), till we come to the act of 1857. Does that act depart from the line of previous legislation, and from what, in our judgment, is sound public policy?

All the sections of that act except two clearly harmonize with previous legislation on the subject. Two of those sections create some doubt. One of them, viz., § 22, is this:

"It shall be lawful for the directors, if in their opinion justice and good faith require it, to continue the existing contracts for the hire of the convicts, with the present contractors, for a period not exceeding four years from and after the first day of *June*, 1857."

It is not shown, in this case, that any of those "existing contracts" involved the removal of the convicts beyond the prison limits, and, hence, the section is perfectly consistent with the close labor practice. Had it been shown that "existing contracts" for outside labor were recognized by the legislature, a different view of the section might have been taken.

The other section referred to is this:

"Sec. 10. The convicts may be levied [or hired] in any number not exceeding one hundred in any one contract, in such manner as the directors, in their judgment, may consider to be most conducive to the interests of the state. All contracts for working convicts shall be given to the highest and best responsible bidder. The directors shall cause such notice to be given by publication, of the time and place of letting to hire said convicts, as they may deem most beneficial to the state. All contractors shall be required to give security to the state for the faithful performance of their contracts, in such amount as the directors, in their judgment, may think proper. In allotting convicts whose labor is thus contracted for, the warden shall do it in such manner as he shall consider will give the convict such knowledge of any mechanical art as will be most conducive to his [their] interests after his [their] discharge." Acts of 1857, p. 103.

Now, this section does not, in terms, authorize the contracting of the convicts to labor outside of the prison bounds; and when we proceed to the question of construction, we are bound to harmonize it with other legislation on the subject, if it can reasonably be harmonized. We must construe it in connection with the previous section quoted, providing that convicts shall be kept at labor in the prison. There is no difficulty in reconciling the two provisions. The commissioners can hire out the convicts at their discretion within the prison bounds. We may observe here that we do not mean by prison limits the space enclosed by the walls of the prison. We think they may properly be defined to include that space, and also the secret enclosure around the prison, be it larger or smaller, which is owned by the state, and appropriated to the uses of the prison. The prisoners, in such enclosure, can be kept separate and secluded from the community at large, and may, while thus kept, be regarded as in prison.

We think the prisoners cannot, under the present statutes, be worked outside of the state grounds adjoining the prison, except such as are taken to *Michigan City* under the act of 1859.

But, as the cause of complaint arose in *Clark* county, we do not think the *Floyd* Circuit Court had jurisdiction of the suit, and, hence, the judgment below dismissing it, is affirmed with costs.

*Per Curiam.*—The judgment is affirmed with costs.

*R. Crawford,* for the appellants (1).

*J. H. Stotsenberg* and *T. M. Brown,* for the appellees (2).

---

(1) Mr. *Crawford* submitted the following argument:

The superintendents of the state prison during their time, and since then the warden, have been in the habit of working more or less of the convicts outside of the prison walls. They required them to make bricks, and haul and carry and lay them; to work on roads, cut cord-wood, do harvesting, and most kinds of farm and common labor; sometimes near the prison, and often several, and occasionally many, miles from it; generally under the care of one or more persons, but frequently single ones or a small number wholly unattended. They were worked at under prices, and the competition thus produced was greatly injurious to the common laborers. The passing and repassing, several times a day, of gangs of felons and desperadoes, whether guarded with loaded

muskets and revolvers, or unguarded, along the public streets of *Jeffersonville*, and the highways adjacent to it, was shocking to every good citizen, dangerous to the public peace, and pernicious to the public morals. The evil had recently been much aggravated by the increased number of convicts. The citizens held public meetings, and repeatedly requested that the prisoners should be confined within the prison. Their requests were unheeded. It is not strange, therefore, that they recently rose, *en masse*, and drove all the prisoners and their keepers back to the prison, declaring they would no longer submit to so intolerable a nuisance.

May Term, 
**1860.**

—————

HELTON 
v. 
MILLER.

An armistice was then agreed upon. The convicts were not to be worked outside of the prison, except upon the land of the state immediately adjoining, until the question, as to the right to work them out, should be decided by this Court; and an action was to be commenced so as to obtain such a decision as early as practicable.

This action was accordingly brought in the *Floyd* Circuit Court, in order to obtain a speedier determination. The defendants entered their appearance to it, agreeing to waive all objection to the jurisdiction of the Court, which might exist because the suit had not been brought in the county where the prison is. The complaint alleges the defendants were, at the time, the warden and directors of the prison; that the prisoners had been worked out of it, around the city and country as aforesaid; and that the defendants would continue so to work them if not restrained by the Court; that the plaintiffs were workmen at similar kinds of business, living in the neighborhood of the prison, and had been materially injured by the defendants' wrongful conduct; and prays for a writ of mandate to be issued, requiring the defendants to confine the convicts within the prison walls. An affidavit was annexed, that the complaint was true, the controversy real, and the proceedings in good faith. The defendants demurred to the complaint, as not stating facts sufficient to constitute a cause of action. The Court held the defendants had no right to work the convicts out of the prison, and that the plaintiffs were entitled to the relief prayed for, but that the *Floyd* Circuit Court could not issue a writ of mandate to operate in *Clark* county, and for that reason only was the demurrer sustained. The plaintiffs excepted and appealed.

We believe both parties desire the direct and full opinion of the Supreme Court, whether the defendants or the warden have a lawful right to work the convicts outside of the prison walls; or if they have, then to what extent and under what circumstances. This is the only question in the case really important to the parties; any others that are involved and may be discussed, are comparatively immaterial. If this Court decides it is the duty of the defendants to keep the convicts wholly within the prison, we doubt not the decision will be obeyed, whatever may be the determination on the further questions, whether a mandamus is the proper remedy, and whether the *Floyd* Circuit Court can issue it.

*First.* The defendants have no right to work the convicts outside of the prison.

1. The state, at large expense, has provided the prison. Its lofty walls, enclosing several acres of ground, are utterly useless and unmeaning, if not intended for enclosing and securely keeping the prisoners committed there. The statutes, uniformly and in express words, require that all convicts to the penitentiary shall be imprisoned in the state prison (2 R. S. p. 396, §§ 4, 5, 7, *et*

*passim*); and that whenever any person is imprisoned in the state prison, he shall be kept at hard labor therein, during the period for which such person was sentenced. 2 R. S. p. 424, § 59. So far the meaning is perfectly clear. There is no room for construction. The form of the prison, and the words of the statute, taken by themselves, require the convicts to be confined within the prison walls, and they admit no other meaning.

2. Is there then any other law which controls this obvious meaning, and gives the defendants a discretion to keep the prisoners within or without the walls at their pleasure?

All prior statutes for the government and discipline of the prison are repealed, and that of 1857 gives all the powers, and prescribes all the duties of the defendants, except the provisions already quoted (R. S. 1857, p. 103). We will examine all its enactments on this point.

Section 2 provides that no person "who is a contractor in the penitentiary" shall be a director. This evidently means, not every one who may have made a contract when within the prison walls, but one who has a contract to work convicts in the penitentiary, no matter where it was made.

Section 5 requires a physician to be appointed, whose duty it shall be to "visit the prison at least once each day." Of course he should visit where the prisoners are to be kept. But convicts working in the country are liable to fall sick there, yet the physician is required to attend at the prison only, and there is no provision for those sick elsewhere.

Section 7 provides that a moral instructor shall be appointed, "who shall reside near the penitentiary, and devote his whole time and ability to the interests of the convicts confined therein." But if part of them are not to be confined therein, they are deprived of the benefit of his instructions, and so far the means of reformation are thrown away.

By § 9 the directors are to attend at the prison, and inspect its different departments and the condition of the prisoners, and hear and examine into the complaints of any of them. But how can they examine into the condition of the prisoners, or hear their complaints, when they are at work in the country?

By § 10 "the convicts may be hired in any number not exceeding one hundred in any one contract, in such manner as the directors may consider most conducive to the interests of the state."

By § 13 the warden is to attend to the purchase "of all articles for the institution, clothing, provisions, medicines, materials for building and repairs; said materials to be manufactured in the penitentiary."

By § 15 all convicts are to be kept at hard labor, "in such manner as the warden shall deem most advantageous to the state," and under such rules as the directors shall prescribe.

By § 22 the directors may, in their discretion, "continue the existing contracts for the hire of the convicts with the present contractors," not exceeding four years from *June* 1, 1857. As the prior law forbade the working of the convicts out of the prison, this Court will not presume any contracts were made for such illegal purpose. And it will not be pretended by the defendants there were any such contracts in force, within the time covered by the complaint. This matter is entirely aside from the main questions which both parties wish decided.

Now, the provisions of §§ 2, 5, 7, 9, and 13 all tend, and some of them tend

strongly, to maintain the proposition, that the defendants are required to confine the convicts within the prison, and, therefore, they are arguments in favor of the plaintiffs, and not against them. And there is nothing in the letter or the spirit of §§ 10 and 15 at all inconsistent with the former enactments, that the convicts should be "imprisoned in the prison." It is later and inconsistent laws only that repeal former ones. Although those sections give the defendants some discretion, yet they are not to disregard all law in the exercise of it, but to exercise it according to law. Else they might hire out the convict for his whole term, to whomsoever, and to be kept wheresoever, the hirer might choose.

3. Females convicted of any crime "the punishment of which is confinement in the state prison," may, instead of such punishment, be imprisoned at hard labor in the jail of the county, under the direction of the jailor. 2 R. S. p. 423, § 57. Now will it be claimed, that the jailer has the right to keep them at work, in or out of the jail, at his uncontrollable discretion?

4. If the defendants can work the convicts outside of the prison walls, what is the limit of their power? If they can take them one rod, why not a mile, or a hundred miles? If they can work them in the city of *Jeffersonville*, why not anywhere in that county, or the state, or, indeed, out of it? No real answer can be made to these questions. For there is no law which says to the defendants, "so far you may go, but no farther;" and if we concede the power in any degree, we concede a wide, lawless, illimitable one.

5. But it has been said, in behalf of the defendants, that "whenever a convict is in the custody of the warden, he is in the state prison." If so, then the warden might proudly say of his prison, as Queen *Victoria* does of her Queen's Bench, that it is "*ubicunque fuerimus.*" Or, rather, it might be said that we have carried into actual operation, the somewhat notorious invention of a former legislator, "the rolling penitentiary." And a sheriff, having a prisoner to commit, would go about inquiring, not where he could find that thing of folly at *Jeffersonville*, miscalled the penitentiary, but where, in all the state, he could find one *David W. Miller*, the real ambulatory state prison. And, of course, wherever found, being the state prison, he would be bound to let in all prisoners duly offered.

6. The practice complained of not only violates the letter, but the policy of the law. Punishment is the chief purpose of imprisonment. The very essence of punishment, and the sole use of the prison walls, is the confinement of the convict within them; his real exclusion from the rest of the world, rendering him for the time *civiliter mortuus*. Humanity indeed forbids, as unnecessary rigor, that his confinement should be absolutely solitary, or that all his natural and civil rights should be temporarily annihilated; but actual enclosure within its walls, is essential to the idea of imprisonment in the penitentiary. And punishment there would be stripped of its chief terror, if the convict felt that he might daily leave the prison and mix with his fellow men outside.

Another principal purpose of imprisonment is the total exclusion of the convicts from society. There are exceptions of course, but the great body of them are bad, and many of them excessively so; and dangerous and pernicious in the highest degree are the presence and example of men who have lost all pride and all shame; who have been guilty of, or are ready for, every kind and extent of crime; who are at war with all law, all order, all virtue, and all decency. What community of good citizens would, if they could help it, sub-

mit to have their families and property exposed to gangs of such wretches as these, daily turned out among them, whether guarded or unguarded? And if the law gave them no remedy, would they not naturally seek to redress themselves? To all this evil have the *Jeffersonville* people been subjected by the practice complained of.

7. The defendants say they have but followed the former practice, and the legislature has tacitly sanctioned that, by not forbidding it. Neither of these propositions is correct. The defendants have not merely followed the former practice, but have aggravated the evil by working out a far greater number of convicts than their predecessors did; and the legislature, so far from having sanctioned the practice, has again and again, in express words, forbidden it.

Prior to 1821, all imprisonment prescribed by law was in the county jails. By the statute of *February* 9, 1821, a state prison was directed to be built, and all convicts to be confined at hard labor therein. The statute of *January* 10, 1822, enacted that convicts should be confined at hard labor in the state prison. The revised statutes of 1824 (p. 399, § 14), of 1831 (p. 512, § 1), of 1838 (p. 572, § 1), required the same. This last statute seems to have continued in force till repealed by 1 R. S. 1852, p. 430, § 1. The statute of 1842, p. 99, § 5, also required the convicts to be worked inside the walls of the prison, except they might be employed in the erection of the new prison (as provided in the previous sections); and a violation of this enactment, was made good cause for removal of the superintendent from office. This statute appears not to have been repealed till 1852. 1 R. S. p. 430, § 1. A statute of 1846 (Loc. Stat. 1846, p. 36, § 4), enacts that "the convicts of said prison shall not be employed without the walls thereof, except in immediate connection with the business prosecuted within said walls; nor shall the labor of said convicts be devoted to any pursuits, that shall interfere with the mechanical pursuits of the immediate neighborhood, but shall be devoted to the rolling of iron and other manufactures." This was continued in force by 1 R. S. 1852, p. 391, § 2, but repealed by statute of 1855, p. 201, § 22, which was itself repealed by that of 1857, p. 103, § 1. A statute of 1849, p. 140, § 1, was passed, providing that "the lessee of the state prison may hereafter employ the convicts of said prison without the walls thereof, in making bricks upon the property belonging to the state, and in chopping and hauling wood to burn such bricks, and in digging and hauling earth to make the same, from such places as may be most convenient for said lessee not on the property of the state, and in the erection of such public buildings, as may now be commenced, or may be authorized by the state hereafter to be built, adjacent to the prison, and such other purposes as may be connected with the prison proper." And, § 5, that "the lessee shall in no case employ or work the convicts out of said prison, within the corporation of the city of *Jeffersonville*, nor elsewhere, in violation of the provisions of this act." But by § 6, this act was to take effect "as soon as the lessee of said state prison shall give his consent thereto in writing, and file the same in the office of the secretary of state." This Court will officially notice what statutes come into force, and will therefore know that said lessee never did consent to said statute of 1849, and that it never took effect. It was referred to in 1 R. S. 1852, p. 391, § 2, not in a way that gave it force as a law, but as containing provisions which the lessee might still accept, and by accepting give them life and validity. The revisions of 1824, p. 124, §§ 3, 4, 5, *et passim*, and of 1831, p. 180, same sections, of 1838, p. 207, same sections, and

of 1843, p. 960, §§ 5, 6, 7, &c., all provide, like the statute now in force, that convicts sentenced to the penitentiary, should "be imprisoned at hard labor in the state prison."

The foregoing is believed to be all the legislation on the point in question. And it is submitted that, instead of the practice complained of being authorized or excused by the former statutes, it was a violation of the express language of many, and of the whole spirit and policy of all of them.

II. The defendants say, by way of affirmative defense, that the number of convicts is greatly increased and the prison crowded; that they have diligently sought to hire more of the convicts to be worked in the prison, but without success; that the workshops and machinery are not sufficient to profitably employ all of them therein; and that thus there has been a necessity for working them out, and therefore they have the legal right to do so. This matter of defense does not arise upon the demurrer to the complaint, but both parties desire the opinion of the Supreme Court upon it, as if it had been set up in an answer, and the plaintiffs had demurred to it.

1. There may be cases of absolute necessity which make a law for themselves; as the breaking out of a highly contagious and fatal disease in the prison, or the prostration of its walls and buildings by a tornado, or the approach of an invading army, and the like. Under such circumstances, the defendants would be required to do, in good faith and with reasonable diligence, only what they should judge most proper. But no such inevitable and disastrous case has happened there. The defendants allege no necessity at all, but a matter of mere convenience and profit. As to the crowd, a ship of war accommodates one thousand men in a fiftieth part of the space these five hundred or six hundred have in the prison. The guests of our best hotels have less room for each, than these convicts have. It is conceded they all lodge in the prison, and certainly working them out by day gives them no more room within at night. As to health, if the prison is kept thoroughly clean and ventilated, there is not the slightest danger from the number of convicts; if it is not so kept, that fact alone conclusively proves, that the most important work of all is in the midst of this idle crowd, and still left undone.

2. Nothing has happened new or extraordinary. The number of prisoners has been gradually increasing, as our population has increased. The legislature, which sat a year and a half since, had the whole matter before them. It was their duty to make such changes in the law, and additions to it, as they judged the circumstances required; and they did so. They authorized a new prison to be built, and the withdrawal of one hundred and fifty convicts from the old to work on the new one. If the governor has not seen fit to take away so many as he was authorized, or to take them so soon as he might, it is very satisfactory evidence that he has not thought the crowd so great as to justify a plain violation of the existing law.

3. But the convicts cannot be worked so profitably within the prison as they can out of it, and therefore they are worked out. Such a ground of defense is, not to speak more severely of it, totally wrong. The state of *Indiana* does not inflict punishment in order to make a profit from it. It would be a disgrace to her and the age to do so. The matter of mere dollars and cents is altogether incidental. Still, if the defendants supposed it was a primary object, then it was their duty to make the most money they could by the prison.

Therefore, why did they not act consistently, by at once hiring out each convict, for his whole term, to himself or his friends, or whomsoever would pay the most, and to go wherever the hirer chose? If they had the power to do this indirectly, and by successive hirings, they certainly had the power to do it directly by a single one, and they would have found it incomparably more profitable. But, by so doing, the great ends of punishment, the reformation of the convicts, and the protection of society against them, would have been utterly disregarded. The Court might then well say to the defendants, "ye have omitted the weightier matters of the law; these ought you to have done, and not to have left the others undone."

III. As to the remedy.

1. A mandamus is proper "in every case where there is no other specific legal remedy for a legal right." Tapp. Mand., p. 9, marginal paging always. "If it be doubtful whether there is another effectual remedy, or the Court does not see its way clearly to one, the writ will be granted." *Id.* 19. "It is no answer to an application for a mandamus, that there is a remedy in equity." *Id.* 22. "Application to enforce an act of parliament is, for the most part, *cx debito justitiæ.*" *Id.* 32. The writ will be granted to compel proceedings to elect a burgess (*id.* 54); to restore to the office of capital burgess (*id.* 56); to abate a nuisance (*id.* 171); to compel all officers of a municipal corporation to do their duties (*id.* 168); and to command judicial and ministerial officers, the first generally, the second specifically (*id.* 176). And see *The Trustees, &c.* v. *Johnson,* 2 Ind. R. 219; *Lewis* v. *Henley,* id. 332; *Hamilton* v. *The State,* 3 *id.* 552; *The State* v. *Custer,* 11 *id.* 210. In a matter of public concern, any citizen may be the relator. *The State* v. *Hamilton,* 5 Ind. R. 310. The state, where its name is used, is but a nominal party, and the action may be in the name of the person interested. *Brower* v. *O'Brien,* 2 Ind. R. 423.—*Smith* v. *Talbott,* 11 *id.* 144.

The complaint alleges, and the demurrer admits, the plaintiffs have been materially injured in their lawful business, by the conduct of the defendants. And that conduct is shown to have been a wrongful violation of a duty, not discretionary, but imperative. It cannot be pretended the plaintiffs have any other remedy. It follows, therefore, they are entitled to a mandate.

2. Had the *Floyd* Circuit Court jurisdiction to issue such a writ in this case? The state prison is in *Clark* county, and the defendants are sued, as its officers, for a violation of official duty. The *Floyd* Circuit Court had no original jurisdiction over them as such, without their consent. 2 R. S. p. 34, § 29. But this was a personal privilege, which they could waive; they had especially agreed to waive it, and by demurring for the cause alleged, they actually waived it. Consent, by those authorized to consent, is always sufficient to give jurisdiction of the person, unless some statute forbids it. *Logan* v. *Patrick,* 5 Cranch, 288.—S. C. Cond. R. 259.—*Gracie* v. *Palmer,* 8 Wheat. 699.—S. C. Cond. R. 561.—*Paulding* v. *The Hud. Man. Co.,* 2 E. D. Smith, 38.

A Circuit Court is authorized to issue such writs (2 R. S. p. 197, § 738); and being a Court of general jurisdiction, and the parties submitting themselves to it, it is competent to hear and determine all the matters arising on the complaint in this action. If it had been commenced in the *Clark* Circuit Court, the power of that Court to issue the writ would be admitted. So, if it had been commenced there, and the venue then changed to the *Floyd* Circuit

Court, the power of the latter Court to try the case and issue the writ, would follow of course. So, the latter Court, after acquiring jurisdiction by consent of the parties, had the same plenary power.

It by no means follows, that the writ must be issued to *Clark* county. Being intended to operate on the defendants personally, it should go where it could be served on each of them, and thus made effectual. The defendants might none of them be found in *Clark;* they might be dispersed in several counties. And this writ, like other process of the Court, could be sent to any county of the state. If it were duly served and disregarded by the defendants, where should an attachment be sent? Evidently, wherever in the state a defendant could be found. The jurisdiction to try rights to lands is local, but to effectuate it, the Court can grant injunctions and attachments against a party, wherever in the state he may be. And actual service of the writ is not necessary, in case of a mandate, any more than in case of an injunction; but if a party has notice of the writ or of the order for it, and violates it, he may be attached, whatever county he is in or may flee to. 3 Dan. Pr., p. 1908.— 1 Barb. Ch. Pr., 634.

(2) The brief for the appellees is lost.

*May Term,*
**1860.**